06-5247-cv
Rice Buick-Pontiac v General Motors Corp.

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term 2007

(Argued: May 8, 2008                    Decided: December 29, 2008)

Docket No. 06-5247-cv

————————————————————————

TOM RICE BUICK-PONTIAC, GMC TRUCK, INC., GARSTEN MOTORS, INC., doing business as Apple Chevrolet, BRIGHT BAY GMC TRUCKS, INC., CARS UNLIMITED OF SUFFOLK LLC, doing business as Nesenger 112 Chevrolet, GARDEN BUICK, INC., KAYSON CHEVROLET, INC., KURLAND CADILLAC OLDSMOBILE-GMC, INC., MANFREDI CADILLAC OLDSMOBILE, INC., SMITHTOWN BUICK, INC., VAN BUREN BUICK PONTIAC, INC., KINNEY MOTORS, INC., doing business as Apple Chevrolet, M&S CHEVROLET, INC., M&S OF PAWLING, INC., WOODBURY AUTO PARK, INC., GEISS AUTO, INC., DURFEE CHEVROLET-OLDSMOBILE-GEO, INC., and DOBLER CHEVROLET, INC.,
*Plaintiffs*,

FULTON CHEVROLET-CADILLAC CO., INC.,
*Plaintiff-Appellant*,

-v.-

GENERAL MOTORS CORPORATION,
*Defendant-Appellee*.[*]

————————————————————————

Before:        HALL, LIVINGSTON, GIBSON,[**] *Circuit Judges*.

Franchised automobile dealerships sued manufacturer-franchisor, claiming insufficient

_____

[*] The Clerk of the Court is directed to amend the official caption as set forth above.

[**] The Honorable John R. Gibson of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

reimbursement under franchise agreements and New York Vehicle and Traffic Law § 465 for repair parts provided to car owners in connection with warranty repair services. The United States District Court for the Southern District of New York (Buchwald, J.) granted summary judgment dismissing the claims of the test plaintiff. This appeal followed.

Affirmed.

ITAMAR YEGER, ESQ. (Leonard A. Bellavia, Barry M. Weiss, Bellavia Gentile & Associates, Mineola, New York, *on the brief*), *for Plaintiff-Appellant*.

JAMES C. McGRATH (Daniel L. Goldberg, Brandon L. Bigelow, Samuel R. Rowley, *on the brief*), Bingham McCutchen LLP, Boston, Massachusetts, *for Defendant-Appellee*.

JOHN J. SULLIVAN (Carl J. Chiappa, *on the brief*), Hogan & Hartson, LLP, New York, New York, *for* Amicus Curiae *The Alliance of Automobile Manufacturers*, *in support of Defendant-Appellee*.

LIVINGSTON, *Circuit Judge*:

New York Vehicle and Traffic Law § 465 requires automobile manufacturers to honor warranty agreements with customers and to compensate franchised dealers for labor and parts associated with warranty repair services at a rate that "shall not be less than the price and rate charged by the franchised motor vehicle dealers in the community or marketing area for like services to non-warranty and/or non-service contract customers, provided such price and rate are reasonable." N.Y. Veh. & Traf. Law § 465. The principal issue raised by this appeal is whether a franchised dealership that over many years consistently submitted claims and accepted reimbursement at a manufacturer's standard rate, without ever seeking additional compensation, may thereafter hold the

2

manufacturer liable under Section 465 for additional compensation on past claims, or whether its initial requests for and acquiescence in reimbursement at the standard rate preclude relief.

The plaintiffs in this diversity action are New York car dealerships who sued defendant-appellee General Motors Corporation ("GM") under Section 465 and their franchise agreements with the company, claiming that GM's standard reimbursement rate for warranty repair parts is too low under the statute. The parties proceeded to discovery solely on the claims of plaintiff-appellant Fulton Chevrolet-Cadillac Co., Inc. ("Fulton"), and GM successfully moved for summary judgment dismissing Fulton's claims. This appeal followed.

*Background*

GM is a Delaware corporation that manufactures and distributes automobiles in the United States through a network of authorized dealers operating under the trade names Buick, Chevrolet, Pontiac, GMC Truck, Hummer, and Cadillac. Since 1981, Fulton has been an authorized Cadillac and Chevrolet dealer in Middletown, New York, pursuant to a series of franchise agreements with GM.

Like most automotive manufacturers, GM warrants certain parts, systems, and accessories in connection with the retail sale of its cars and reimburses franchised dealers for performing repair work under these warranties. In order to be reimbursed for parts and labor provided in connection with a warranty repair, dealers must submit a claim to GM using a computerized system called the

Warranty Information Network System ("WINS").[1] To use this program, which allows GM to reimburse dealers across the country based on a uniform methodology, a dealer electronically inputs into a computer certain information about the work performed in connection with a warranty repair job. The dealer is not required to submit underlying repair orders, but must input the repair order number and date, the vehicle identification number of the car under repair, the vehicle's mileage, the applicable "labor operation" number, the primary failed part number, and the parts reimbursement amount. The "Line Total," which reflects the total amount of reimbursement the dealer is requesting for the warranty repair, is then calculated automatically by the dealer's computer pursuant to a GM-specified formula, and the dealer is given the opportunity to review the Line Total before submitting the claim.

WINS typically reviews, approves, and pays warranty claims automatically without any individual review by a GM employee. The system will not approve a claim automatically, however, if it does not fall within certain parameters, for example, if it seeks reimbursement for repair parts in an amount that exceeds a certain ceiling. That ceiling is determined pursuant to a GM-specified formula, which involves multiplying the dealer list prices for the parts being used in the repair by a standard parts markup for the dealer. The standard parts markup used by WINS for most dealers in the United States currently is forty percent. Hence, for most dealers, a reimbursement claim will not be approved automatically by WINS if it seeks more than 140 percent of the dealer list prices for

[1] GM's standard franchise agreement—the Dealer Sales and Service Agreement—provides that reimbursement for warranty repair work "will be made according to policies in the Service Policies and Procedures Manual." The manual describes the general requirements for submitting claims via an electronic repair order system, and directs dealers to a separate WINS Claim Processing Manual for more specific instructions.

the parts used in the repair.

Although most claims submitted through WINS are processed in this way, there are several mechanisms for bypassing the automated procedure and seeking reimbursement at a higher rate than that allowed by the ordinary WINS formula. For example, if a dealer wants a GM employee to review an individual reimbursement claim, it can "H-route" the claim via the WINS program to its GM service representative and include comments explaining why individualized review is desired and seeking permission to submit a claim for reimbursement at a higher rate. In addition, dealers may submit "P" code claims when a warranty repair requires more parts than the limit provided for by the associated labor operation. WINS allows a dealer also to submit a "case add credit" in circumstances where it seeks additional reimbursement on a previously submitted claim.

Dealers may submit warranty reimbursement claims via WINS at any time. The program processes standard claims twice per week, and provides dealers with "claims memos" on the day following such processing. These memos report the disposition of any warranty claims submitted during the last cycle. Approximately ninety percent of warranty claims are approved upon initial submission, and ordinarily are paid within ten days. If a dealer is unhappy with the disposition of a claim, however, it can resubmit the claim using the H-route procedure and include comments explaining the dealer's dissatisfaction. The dealer also may appeal directly to its service representative, or invoke certain dispute resolution procedures described in its franchise agreement with GM.

All authorized GM dealers throughout the United States use WINS to submit warranty reimbursement claims. GM processes and pays approximately 48 million claims through WINS each

year. During 2003, GM approved about 1.9 million claims from New York dealers, which accounted for approximately $183 million in reimbursements.

Since 1996, Fulton regularly has submitted warranty reimbursement claims to GM. In the five-year period from 1999 to 2004, it submitted approximately 22,000 claims, which resulted in compensation from GM in excess of $3.8 million. Fulton's Dealer Sales and Service Agreement with GM provides that "Dealer . . . agrees to timely submit true and accurate applications or claims for payments." According to the deposition testimony of Fulton's owner, Jonathan Worts, each of the claims submitted by Fulton since 1996 was true and accurate.

Fulton concedes that while it occasionally submitted H-route requests for unusual or additional labor costs, it never sought additional payment for parts or otherwise requested that GM reimburse it for warranty parts at a higher markup than the forty-percent rate used by WINS for automatic claim processing. Indeed, the parties know of no New York GM dealer that has submitted an individual warranty claim seeking in excess of GM's standard rate for parts reimbursement.[2]

---

[2] There is evidence that Karp Buick of Rockville Centre sent a letter to the Northeast Market Area Manager for GM on July 19, 1999, complaining generally that GM had paid too little for warranty parts under New York law, and demanding incremental payment on previously submitted claims as well as a higher reimbursement rate going forward. GM responded on September 8, 1999 that any dealer was "free to request an individualized assessment of its 'retail' markup at any time." GM suggested that if Karp Buick wished to pursue this course, it should submit a series of recent repair orders as well as invoices showing its retail prices for repair parts, and that GM then would determine if the dealer was entitled to compensation at a higher rate going forward. GM declined, however, to give incremental reimbursement on past claims that no longer were timely under the franchise agreement. There is no evidence that Karp Buick used the procedure described in GM's letter to attempt to establish a higher rate going forward, or that it submitted via WINS a timely request for additional reimbursement on previously paid claims.

In addition, on August 24 and September 11, 2001 respectively, Manfredi Auto Group of Staten Island and Bright Bay GMC Truck of Bay Shore sent letters to GM demanding that the

Fulton insists that such a request would be futile. The record shows, however, that GM has received such claims from dealers in other states, such as Illinois, Maine, and New Jersey, either through WINS or by letter, and typically has honored them after verifying what the appropriate rate of reimbursement should be. Indeed, Worts owns a Chevrolet dealership in New Jersey that requested a higher rate in accordance with New Jersey law. Since 1999, this dealership has been able to use a special WINS code to receive reimbursement at this higher rate.

On July 16, 2001, ten present and former GM dealers in New York filed a complaint against GM. On December 18, 2002, they filed an amended complaint, adding Fulton and seven other plaintiffs, one of which subsequently dismissed its claims voluntarily. The gist of the amended complaint is that the standard forty-percent parts markup used by WINS is approximately thirty percentage points below the parts markup used by dealers in plaintiffs' community for non-warranty repairs.[3] The complaint alleges also that because WINS allows a dealer to submit only limited information about a warranty repair, it is "designed to frustrate any attempt to add additional information or add more particular information," such that "if a dealer attempts to input a reimbursement rate other than the rate that GM's computer sets as a default, that dealer's claim cannot be processed." Accordingly, plaintiffs allege, GM's requirement that dealers use WINS to submit reimbursement claims has led to systematic undercompensation for warranty repair parts

company alter the WINS program to allow dealers to input more information into the computer and to request a higher reimbursement rate for parts than that allowed by the standard formula. The record does not contain any responses from GM, or evidence that these dealers attempted to use the H-route, P code, or "case add credit" procedures for requesting additional reimbursement.

[3] Fulton now asserts that the standard forty-percent parts markup in fact is about thirty-five percentage points below the going non-warranty rate in Fulton's community.

since 1992, when New York Vehicle and Traffic Law § 465 was amended to require reimbursement at the rate prevailing in the dealer's community for non-warranty repair parts.[4]

The dealers asserted claims under Section 465 as well as a provision of GM's standard franchise agreement requiring the company to comply with all applicable laws. The dealers seek, *inter alia*, incremental payment on previously submitted claims based on what they allegedly would have been paid had GM used a proper markup for parts, as well as an injunction barring GM from using its standard, nationwide formula to determine reimbursement amounts for warranty repairs performed by New York dealers.

Fulton was chosen as the test plaintiff and the parties proceeded to discovery only on Fulton's claims, which revealed the above undisputed facts. GM moved for summary judgment, denying any violation of Section 465, but arguing also that Fulton is precluded from suing under the statute because it has requested and accepted payment based on the standard forty-percent parts markup rate without complaint since 1996. The district court granted the motion and dismissed Fulton's claims. *Tom Rice Buick-Pontiac GMC Truck, Inc. v. Gen. Motors Corp.*, No. 01 Civ. 6410 (NRB), 2006 WL 2322626 (S.D.N.Y. Aug. 10, 2006). Fulton now appeals.

---

[4] Fulton has acknowledged that the statute of limitations on its claims is three years, *see* N.Y. C.P.L.R. § 214(2) (providing three-year limitations period for "an action to recover upon a liability . . . imposed by statute"); *Tom Rice Buick-Pontiac GMC Truck, Inc. v. Gen. Motors Corp.*, No. 01 Civ. 6410 (NRB), 2006 WL 2322626, at *1 n.4 (S.D.N.Y. Aug. 10, 2006), and thus seeks additional reimbursement only for warranty repair jobs performed within the three year period prior to the time this action was commenced.

8

*Discussion*

We review a district court's grant of summary judgment *de novo*, viewing the facts in the light most favorable to the nonmoving party and resolving all factual ambiguities in its favor. *Singh v. City of New York*, 524 F.3d 361, 366 (2d Cir. 2008). Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

This appeal hinges primarily on a single question of law: whether Fulton's consistent requests for and acceptance of payment at GM's standard warranty reimbursement rate, without asking for more or notifying GM of its belief that a higher rate might be warranted under Vehicle and Traffic Law § 465, precludes recovery of additional payment under the statute for past claims. Neither the New York Court of Appeals nor any intermediate New York appellate court has addressed this question. "In the absence of authoritative law from the state's highest court, we must either (1) predict how the New York Court of Appeals would resolve the state law question, or, if state law is so uncertain that we can make no reasonable prediction, (2) certify the question to the New York Court of Appeals for a definitive resolution." *DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir. 2005). In this case, we find the former option appropriate and conclude that Fulton's failure to demand additional compensation for any past claims pursuant to Section 465 precludes the relief it now seeks.

Our cardinal function in interpreting a New York statute is to ascertain and give effect to the intent of the legislature. *Abrams v. Ford Motor Co.*, 74 N.Y.2d 495, 500, 548 N.E.2d 906, 908 (1989); *see* N.Y. Stat. Law § 92. "As the clearest indicator of legislative intent is the statutory text,

the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof." *Majewski v. Broadalbin-Perth Cent. Sch. Dist.*, 91 N.Y.2d 577, 583, 696 N.E.2d 978, 980 (1998); *see* N.Y. Stat. Law § 94. We therefore begin, as we must, with the text of Section 465, which reads in relevant part as follows:

> 1.  Every franchisor shall properly fulfill any warranty agreement and/or franchisor's service contract and shall compensate each of its franchised motor vehicle dealers for warranty parts and labor in amounts which reflect fair and reasonable compensation for such work. All warranty claims and/or claims under a franchisor's service contract made by franchised motor vehicle dealers shall be paid within thirty days following their approval provided, however, that the franchisor retains the right to audit such claims for a period of two years following the submission thereof, and to charge back any amounts paid on false, fraudulent, incorrect or unsubstantiated claims. For parts . . . and labor reimbursement, fair and reasonable compensation shall not be less than the price and rate charged by the franchised motor vehicle dealers in the community or marketing area for like services to non-warranty and/or non-service contract customers, provided such price and rate are reasonable.
>
> 2.  All warranty claims shall be either approved or disapproved within thirty days after their receipt. When any such claim is disapproved the franchised motor vehicle dealer shall be notified in writing of its disapproval within said period. Each such notice shall state the specific grounds upon which the disapproval is based.

N.Y Veh. & Traf. Law § 465.[5]

Section 465 plainly imposes on manufacturer-franchisors the obligation to reimburse

---

[5] We note that N.Y. Veh. & Traf. Law § 465 was recently amended, effective January 1, 2009. *See* Act of Aug. 5, 2008, ch. 490, sec. 3, N.Y. Veh. & Traf. Law § 465, 2008 N.Y. Sess. Laws 1329, 1338-40 (McKinney). As these amendments do not become effective until January 1, 2009, however, we need not consider them here.

franchised motor vehicle dealers for warranty repair parts "in amounts which reflect fair and reasonable compensation." The statute likewise plainly contemplates that franchisees will submit claims for such compensation. Because Fulton requested payment on past warranty reimbursement claims, the issue here is whether GM's payment of the requested amount discharged its duty to pay under the statute, or whether it had an additional obligation to pay more, regardless of what was requested. That is, we must determine whether a "claim" for purposes of Section 465 is a demand for money in a particular amount, such that it is "paid" when the demanded amount is disbursed, or whether a "claim" more generally is a simple request for money, not necessarily for any particular amount, such that it is "paid" only when the statutory rate is given, regardless of the amount actually requested.

Relying principally on *Ralph Oldsmobile Inc. v. General Motors Corp.*, No. 99 Civ. 4567(AGS), 2000 WL 1459767 (S.D.N.Y. Sept. 29, 2000), Fulton argues that because the statute imposes on a manufacturer the duty to provide statutorily defined "fair and reasonable compensation" for warranty parts, but says nothing of a dealer's obligation to make a particularized claim requesting a specific dollar figure, a manufacturer is required to pay the statutory amount no matter how much is requested—indeed, whether any specific dollar amount is requested at all. *See id.* at *5-7 (concluding that dealers could pursue claims against GM under Section 465 despite requesting and acquiescing in payment at lower amounts). We disagree.

The relevant dictionary definition of "claim" is "a demand for compensation, benefits, or payment" in conformity with a law or contract, and also "*the amount or payment of such a demand*." *Webster's Third New International Dictionary* 414 (2002) (emphasis added). A claim is thus not

only "[a] demand for payment in accordance with an insurance policy or other formal arrangement," but also "[t]he *sum of money demanded*." *The American Heritage Dictionary of the English Language* 341 (4th ed. 2000) (emphasis added). We conclude that the most natural and obvious understanding of "claim" in the context of Section 465 is a request for reimbursement in a specific amount.

This reading makes sense of Section 465's broader context. By its plain terms, the statute obliges a manufacturer not only to provide fair and reasonable compensation for warranty parts, but also: (1) to approve or disapprove all warranty claims "within thirty days after their receipt"; (2) to notify the dealer in writing of any disapproved claim within the thirty day period, "stat[ing] the specific grounds upon which the disapproval is based"; and (3) to pay approved claims "within thirty days following their approval." N.Y. Veh. & Traf. Law § 465. Though it is possible to read this language as contemplating the submission of claims without regard to amount, the more natural construction of these provisions is that they together provide a mechanism by which dealers and manufacturers can identify and communicate openly about areas of disagreement as to what constitutes "fair and reasonable compensation." But this requires that dealers submit claims not in the abstract, but for specific amounts. Otherwise it is hard to fathom how a manufacturer might approve or disapprove the claim in most cases, much less provide reasons for its rejection. *Cf. Darling's v. Ford Motor Co.*, 1998 ME 232, ¶ 6, 719 A.2d 111, 114 (1998) (noting, with regard to a Maine statute imposing similar obligations on manufacturers, that "[a]ccomplishing these objectives necessarily requires that a dealer submit a claim that is sufficiently individualized to enable a manufacturer to satisfy these obligations.").

12

Furthermore, the New York Court of Appeals instructs courts to construe New York statutes in ways that "avoid objectionable, unreasonable or absurd consequences." *Long v. State*, 7 N.Y.3d 269, 273, 852 N.E.2d 1150, 1153 (2006); *see* N.Y. Stat. Law § 141. Adopting the position advanced by Fulton would unreasonably burden manufacturers such as GM, since they could no longer assume that simply paying the full amount requested by a dealer would resolve a claim. Under Fulton's view, if a manufacturer wished to protect itself against potentially expensive litigation, it would have to conduct an inquiry not simply with regard to contested claims, but with regard to every claim in every marketing area in New York State to ascertain the prevailing market rate. Such investigations could considerably increase the administrative costs of the claims system and require the manufacturer to spend more time processing each claim. This delay would not benefit the manufacturer or dealers. We see no basis for concluding that the New York legislature intended to inject unnecessary administrative costs and delays into the normal business practice of claim settlement, particularly when our alternative and more plausible construction of Section 465 avoids this result while imposing on dealers only the relatively trivial burden of making timely requests for compensation at higher rates than what the manufacturer typically pays.

We note also, as did the district court, that allowing Fulton to reopen closed accounts by means of a lawsuit and to disturb previously paid claims would undermine a number of common law principles recognized in New York, such as the doctrines of account stated, *see Rodkinson v. Haecker*, 248 N.Y. 480, 485, 162 N.E. 493, 495 (1928) ("As a general rule, where an account is made up and rendered . . . [and] the party receiving it . . . makes no objection within a reasonable time, his silence will be construed into an acquiescence in its justness, and he will be bound by it as

13

if it were a stated account."), equitable estoppel, *see Shondel J. v. Mark D.*, 7 N.Y.3d 320, 326, 853 N.E.2d 610, 613 (2006) ("The purpose of equitable estoppel is to preclude a person from asserting a right after having led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted."), and waiver, *Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.*, 85 N.Y.2d 232, 236, 647 N.E.2d 1329, 1331 (1995) ("Waiver requires the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable. Waiver may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage." (citations omitted)). We need not conclude that these doctrines are directly applicable to note that Fulton's interpretation of Section 465 is yet more implausible because it is at odds with these basic precepts of the common law. *See* N.Y. Stat. Law § 153 ("A change in long established rules of law is not deemed to have been intended by the Legislature in the absence of a clear manifestation of such intention."); *cf. Hechter v. N.Y. Life Ins. Co.*, 46 N.Y.2d 34, 39, 385 N.E.2d 551, 554 (1978) ("[I]t is a general rule of statutory construction that a clear and specific legislative intent is required to override the common law.").

Finally, our conclusion is bolstered by the decisions of several courts interpreting analogous statutes in other jurisdictions. *See Woods v. MONY Legacy Life Ins. Co.*, 84 N.Y.2d 280, 285, 641 N.E.2d 1070, 1072 (1994) (considering other jurisdictions' treatment of similar law in construing a New York statute); *see also* N.Y. Stat. Law § 262 ("In interpreting an ambiguous statute of New York, the court may consider the construction placed on a similar statute of another state or country by its courts."). Each of these courts has arrived at the result we reach here, concluding that before

14

a dealer may hold a manufacturer liable for reimbursement beyond the manufacturer's standard rate, it first must submit a claim to the manufacturer requesting the additional amount. *See Jim White Agency Co. v. Nissan Motor Corp.*, 126 F.3d 832, 836 (6th Cir. 1997) (concluding that dealer "waived its right [under Ohio law] to retail payment on previously submitted warranty claims because it had failed to request payment at rates other than cost plus a 30% markup, the amount stated in the dealership contract"); *Acadia Motors, Inc. v. Ford Motor Co.*, 844 F. Supp. 819, 828 (D. Me. 1994) ("To the extent that Plaintiffs request 'damages for [Ford's] past failures to reimburse the Plaintiff dealers at the statutory rate,' . . . Plaintiffs did not make an adequately particularized claim to Ford prior to bringing this action. [Under Maine law,] Ford is entitled to some notice informing it of the pertinent facts regarding the claim that would enable it to determine whether the claim should be approved or denied."), *rev'd in part on other grounds*, 44 F.3d 1050 (1st Cir. 1995); *Kronon Motor Sales, Inc. v. Ford Motor Co.*, No. 93 Civ. 2853, 1994 WL 127322, at *3 (N.D. Ill. April 7, 1994) ("[T]he inescapable fact is that since Kronon did not submit a claim for reimbursement at its retail rate [under Illinois law], it necessarily acquiesced in Ford's designated reimbursement rate."), *aff'd on other grounds*, 41 F.3d 338 (7th Cir. 1994); *see also Darling's*, 1998 ME 232, ¶ 7, 719 A.2d at 114-15 (interpreting Maine statute as requiring dealer to submit "individualized claim" in order to receive additional compensation on previously paid claim, which could be accomplished by specifying, among other things, the difference between the amount received pursuant to the manufacturer's automated system and the dealer's retail price); *cf. Liberty Lincoln-Mercury v. Ford Motor Co.*, 134 F.3d 557, 573-74 (3d Cir. 1998) (holding that dealer that accepted payment at standard rate could not recover incremental reimbursement under New Jersey

statute absent timely requests for additional payment on those claims pursuant to franchise agreement). We see no reason why New York's law should be interpreted any differently than the statutes considered by these courts.

Accordingly, we hold that Fulton may not recover under New York Vehicle and Traffic Law § 465 for additional sums on previously paid warranty claims, absent evidence that it submitted claims for additional payment and that these claims were rejected by GM contrary to the statute's mandate. Fulton's belief that submitting such claims would have been futile is belied by the record, which shows that GM provides numerous means for a dealer to request additional compensation beyond what is allowed by the standard WINS formula, such as the H-route, P code, and "case add credit" procedures, not to mention the possibility of simply writing a letter to a regional GM representative. Furthermore, because we conclude that a dealer may not hold a manufacturer liable under Section 465 for additional compensation without first having submitted a claim for such payment, and because there is no evidence that Fulton has done so, it follows that Fulton is precluded from receiving the prospective relief it seeks. It follows as well that the district court properly granted summary judgment dismissing Fulton's contract claim, which is derivative of its claim under Section 465.

We note that it is unnecessary for us to decide the issue, about which the parties argue at length, whether a dealer or a manufacturer is in the best position to determine the rate charged in a dealer's community for non-warranty repair parts. We hold only that a dealer may not recover additional sums on previously paid warranty claims, or secure an injunction ordering a manufacturer to reimburse at a higher rate than it customarily pays, absent evidence that the dealer submitted a

16

claim for additional payment that was rejected by the manufacturer contrary to Section 465. Whether a manufacturer could disapprove such a claim, consistent with Section 465, on the ground that the dealer did not provide adequate information to establish its community rate for non-warranty repair parts is a question we leave for another day.[6]

*Conclusion*

We agree with the district court that an automobile manufacturer discharges its duty to provide fair and reasonable compensation for warranty repair parts under New York Vehicle and Traffic Law § 465 when it pays a warranty claim in the amount requested by the dealer. A manufacturer is not exposed to liability for failure to pay additional amounts when the dealer requested and acquiesced in reimbursement at the manufacturer's standard rate and never asked to be paid at a higher rate. We therefore affirm the district court's grant of summary judgment dismissing Fulton's claims.

---

[6] We do note, however, that the amendments to N.Y. Veh. & Traf. Law § 465 discussed above create a mechanism by which a dealer may establish the price and rate they charge non-warranty customers for parts and claim such price and rate, including an average markup, as their reimbursement rate with the benefit of a rebuttable presumption that the claimed reimbursement rate is fair and reasonable. *See* Act of Aug. 5, 2008, ch. 490, sec. 3, N.Y. Veh. & Traf. Law § 465, 2008 N.Y. Sess. Laws 1329, 1338-40 (McKinney).

1